The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is Commonwealth of Massachusetts et al. v. Wampanoag Tribe of Gay Head et al. Appeal No. 191661, Appeal No. 191729, Appeal No. 191857, and Appeal No. 191922. Thank you. You may proceed, Counsel. Good morning. May it please the Court, Scott Crowell on behalf of the Wampanoag Tribe of Gay Head et al. and the Tribal Appellants and Parties to these appeals. I wish to reserve five minutes for rebuttal. You may. In 2017, this Court issued its opinion that the Indian Gaming Regulatory Act preempted the Massachusetts Indian Land Claims Settlement Act over ruling Judge Saylor in reaffirming this Circuit's decision in Narragansett. Mr. Crowell. Yes. In that first appeal, you presented three issues to the Court. What is your best argument as to which issue contained in your brief reflects that you were also appealing the town regulations? To your direct question, we appealed the misapprehension of Judge Saylor regarding the application of Narragansett in the interplay between the Indian Gaming Regulatory Act and the Settlement Act. The analysis there was that the Indian Gaming Regulatory Act preempted the Settlement Act, and that preemption is not, as Judge Saylor first articulated in 2019, this narrow definition of those laws that authorize particular forms of gaming to the exclusion of all other laws. Rather, Congress, in the enactment of IGRA, created a comprehensive regulatory scheme that involved a myriad of aspects involving a tribe getting into business and governing gaming activities on its Indian lands, and that scheme expressly includes construction, occupation, and operation of gaming facilities. So, on the question of waiver, there's really two points, or two major points. I haven't gotten an answer. Counselor, I still need an answer as to which question. You presented three distinct questions. Which one of the questions do you believe covers the zoning and other health and welfare regulations? Whether the Indian Gaming Regulatory Act preempts the Settlement Act. So, when you mentioned the word in your first issue regarding gaming on Aquina Island, I mean Indian lands, to you, you intended that to be encompassing of everything. I think that goes right to the core of the errors in 2019. The gaming laws is to be looked at contextually as the comprehensive, sophisticated regulatory scheme that Congress established in the passage of the Indian Gaming Regulatory Act, and is even more expressly manifested in both the regulations of the National Indian Gaming Commission and in the federal minimum requirements that the tribe complies with in terms of putting it into its own gaming code as to the manner in which these facilities will be constructed, occupied, and operated. So, the fact that the district court separated specifically gaming from regulatory local ordinances, you didn't think it was necessary to at least address the local ordinances or at least indicate in your briefing that you were intending to cover them since the court had addressed them separately? Well, two points. The delineation between gaming laws narrowly defined and general regulatory laws broadly defined wasn't done in the 2015 order. That appeared for the first time in the 2019 order. The earlier order said, well, in the final judgment, the injunction continues to apply, but the underlying argument that's implicit in the preemption argument that we presented to this court was not that this narrow definition of gaming laws is preempted by the Indian Gaming Regulatory Act, but that gaming laws as contextually understood in the comprehensive and regulatory scheme enacted by IGRA as part of the Indian Gaming Regulatory Act. So, I harp on the distinction being delineated for the first time. There is about five minutes left. Being defined in 2019, because we clearly didn't waive our ability to argue that articulation, which goes far beyond the narrow injunction that was at issue in 2015, is clearly right for this appeal. Would your argument encompass liquor licensing? Well, two comments. One is, I think liquor licensing is one of those penumbra arguments as to whether it's peripheral to gaming or not. But two, another body of case law, Rice v. Rainer, in which the Supreme Court ruled that service of alcohol is not an inherent exercise of sovereign authority, governs alcohol service. So, we would have to work in compliance with state law under our approved liquor ordinance, whether or not that be at a gaming facility or any other facility on tribal lands. There are other hypotheticals that we put in the briefs that I think fall into that penumbra area, but liquor licenses is clearly an area where the state does have a role. Is there any conflict between the local non-gaming ordinances and regulations and any regulations that the federal government has approved? Well, certainly, as articulated by the Martha's Vineyard Commission in their own amici briefs, they look to impose upon the tribe restrictions on whether there has to be housing for employees, what the design is, whether it's consistent with the character, or any other aspect that's so broad that where the federal law says, you know, if you meet your requirements, it says you're going to build in a manner that protects public health and safety. And we've manifested that through here, through folks, to see what the state does, hiring the best state license inspectors in the state to do that function, to have the tribal gaming agency only issue facility licenses once that certification is done. So if the tribe meets that and has the green light to do it on that, then for the town to come in and say, oh, well, you know, we demand that you do these other things in order for you to be able to open or even begin construction on your gaming facility, yeah, that's conflict. Well, let me ask it in a more practical term, because I'm not sure that is conflict. Is there any town non-gaming law that if you complied with that, then you would be unable to comply with a federally approved tribal law? Well, I believe that both the permits that the town has brought at issue are exactly that. Both their initial building permit and the permit or the green light of the Martha's Vineyard Commission basically say, you cannot even begin unless you allow us to interfere with all these different aspects in the way in which we construct or design or build or operate or occupy your gaming facility. And that's in contravention of AGRA. Their discretion is so broad that they can basically deny those permits for any reason. This is not a question of making sure that the electrical outlet has a certain capacity. This is the city and the Martha's Vineyard Commission saying, we're going to control all these aspects of the gaming facility before you can even begin to construct that facility. I'm not sure I heard it. For example, if you say capacity, say five watts, something has to be five watts under the town law and has to be three watts under the tribal law approved by the federal government. You could comply with both even though they're different and even though the town one would prohibit you from operating if you only satisfied the tribal one. Well, I believe that would be a conflict that interferes with the tribe's ability to exercise its rights under AGRA. You know, if the tribe has an ordinance that's in place and it meets that... Council, that's time. Thank you. Could he answer the question, though? Yes, please. So, you know, when the tribe meets its federal requirements and the town says that's not good enough, we're going to restrict your right to game by imposing these additional laws over and above what tribal law and federal law has applied, you know, is an interference with the tribe's gaming laws. And even if it's not a black and white conflict, you look at the Cayuga case, the North Dakota cases, the Oklahoma cases that we've cited in our briefs. It's that ability to indirectly do what you cannot do directly that constitutes the interference with the tribe's exercise of its rights that warrants the preemption of those state and local laws. In fact, even the recent Supreme Court case, NCAA versus Murphy, makes it clear that when Congress intends to supplant a regulatory scheme in full preemption, which is what you have here, even parallel state or local statutes are not to be applied. And to allow them to be applied here, particularly in these situations where they're harping on permits, whereby their own admission has such broad discretion, doesn't work. For example, actually a clear conflict is town law says no commercial activities, except on those lands that are owned by the town of Akwene itself. And so the tribe would be violating that town ordinance by constructing a gaming facility. From the very beginning, the town has looked to its non-gaming laws to interfere with the tribe's exercise of its gaming rights. Thank you. Yes. Yes, Judge. Attorney Crowell, you can mute your audio and video and Attorney Jay, you may unmute and proceed with your argument. Good morning. Good morning. Thank you, Your Honor. I wanted to pick up with the substance of Mr. Crowell's argument because the substance of the argument is exactly what was litigated before the district court in the first go-around. And if you look in particular at pages 14 to 16 of the opposition brief that the tribe filed in that proceeding, and at the transcript of the hearing in a couple of places, which we cited in our brief, including page 1042 of the appendix filed in this court, you will see- I would like to go back a little more than that. Starting with the complaint of the AGHCA, which I believe you represent also. I'm speaking for the AGHCA this morning, Your Honor, although they have separate- Well, in that complaint, on page two, you assert claims based on, quote, recent gaming-related actions. What do you mean by recent related gaming actions? What are they related? What do you mean by that? What's included in that statement? So I believe at the time the AGHCA filed its complaint, so this would be the motion to intervene in the original case back in, I think, 2013. Fourteen. 2014. Sorry. I believe that at that time, the tribe was moving forward with converting the community center that existed on tribal land to a gaming facility. I'm talking about the complaint you filed to intervene. You made that statement. And you were referring to pertinent regulatory, permitting, and licensing requirements, including the relevant local zoning ordinances specified in the settlement agreement. So I still would like to know what you included in game-related actions. So the question you're asking, Your Honor, is what did we mean by game- What did the community association mean by gaming-related actions of the tribe? What actions was the tribe taking? I want to make sure- Your Honor, reading from a document that I don't have in front of me, I wanted to make sure I'm understanding the question correctly. Well, you filed the intervening complaint, and you used the term recent gaming-related actions. What are you referring to? And then you include licensing requirements, including the relevant zoning ordinances. The tribe has always taken the position that it could open a gaming facility, which is what it seeks to do, without complying with either the Commonwealth's gaming laws, which were the focus of the last appeal, or any state or local regulatory requirements, whether they relate to gaming or not. Let me change the subject slightly. Under the present situation, do the town's zoning ordinances apply to the Indian lands? Yes, because of the Settlement Act, which says that the local regulatory laws apply on the Indian lands in the town, just as they apply to other lands in the town. Zoning, of course, is one example that this court in Narragansett gave of laws whose survival, after the passage of IGRA, it was not passing on in that case. Okay, so that means that the town can zone the Indian lands as not appropriate for a casino. No, Your Honor, and I appreciate the opportunity to clarify that. This goes to the point that my friend Mr. Kroll made at the end of his presentation. If the question is whether generally applicable town ordinances, such as the zoning plan, can be used to prevent gaming specifically, in other words, I think what he said was to do indirectly what IGRA prevents the town from doing directly, the district court made very clear that it wasn't passing on any such theory because it didn't have that here, and invited the tribe to come back to him. And that's in a couple of places, page 53 of the addendum, and then at the hearing transcript, pages 1056 and 57 of the joint appendix. The district court made clear that he did not see any evidence of such a pretext here, but invited the tribe to come back if it had any evidence that local law was being manipulated to prevent gaming from being conducted as this court's prior opinion would allow. But that doesn't mean that neutral, generally applicable laws don't apply, and that is the concept that the tribe resists. Wait a minute, you say the zoning laws are still applicable to the settlement lands? So the settlement act that Congress passed in 1988 makes all of the town's regulatory laws applicable to the Indian lands in the town, which is different from what might be true on other tribal lands in other states that don't have a specific settlement statute. So the only question is, to what extent did IGRA repeal, impliedly, that grant of regulatory authority to the town, and of course also the commonwealth? So yes, my answer is yes, all local laws apply on the town's lands because that is what the parties agreed to in the 1983 settlement, and it is what Congress memorialized in the settlement act. As I understand your position, and help me if I'm wrong here, I thought your position was, in the abstract, zoning laws are not categorically repealed by the federal act, and so they can be applied with several caveats. One is, if you had a zoning rule that said no gaming, that's no good. And secondly, if you took a facially neutral zoning one and pretextually applied it in a way to prevent gaming, then that would be no good. That's what I understand your position to be and how we should interpret the two acts. Yes, that's correct, Judge Kayada, that neither an overt nor an implicit attack on gaming could be used, could be conducted through the zoning laws. And I guess I jumped straight to the second one in pointing out that the district court had said that there is no such indirect attack here and that invited the tribe, if it ever had evidence of that, to raise it. So under your argument as to what they waived by not arguing in the first appeal, as I understand it, you're not maintaining that the tribe is precluded now from when it goes through and tries to comply with town permits. If any permit to use Narragansett interferes with any of the integral parts of the gaming or prohibits gaming de facto or is used as a pretext, then that's still open to be adjudicated. Prohibits gaming de facto or is used as a pretext. Yes, I agree with that, Your Honor. The final judgment that was appealed from here, what did it include? What did the final judgment say? The final judgment that is on appeal in this appeal, Your Honor, not the prior appeal. Oh, no, the prior appeal. The prior appeal. So that is in the addendum to the tribe's brief. I know where it is. I'm asking you, what do you feel are the important parts of it? I don't want to take up your time anymore than I have to, but basically I'm going to the fact that the judgment appealed from said judgments hereby declared blah, blah, blah, cannot construct, license, open, or operate any gaming facility at the settlement without complying with the laws and regulations of the Commonwealth, the town of Aquina, including any pertinent state and local permitting requirements. That's paragraph three. Paragraph four says something quite similar. Yes. Okay. The next thing is the notice of appeal says from an entry of a final judgment entered on this action January 5, 2026. They're appealing all six. The notice of appeal, as with any notice of appeal, simply says that they're appealing from the final judgment. That's right. But the question under this court's cases, like Matthew's, is what did they then pursue in the appeal, not what they put in the notice of appeal. And they identified in Judge Thompson's question to my friend brought this out. They identified not only three issues, but three specific orders from which they were appealing. That is in their opening brief in the last appeal. And those three orders were the summary judgment opinion, the denial of reconsideration, and the ruling on the Rule 19 motion about whether the Gaming Commission was a necessary party. Nothing about the proceedings on the local permitting requirements. Five minutes remaining. I'm sorry, Your Honor. It was not me. Five minutes remaining. Okay. We've been talking about an arrogant case. I believe that would you say that this is a comprehensive federal regulatory scheme that we're dealing with here? Not in the sense that my friend Mr. Crowell was arguing. I take this court to have said that it is comprehensive with respect to gaming. We're not here before this panel taking issue with that. But it is not comprehensive with respect to every aspect of the activities that might surround gaming on tribal lands. Narragansett, I think, makes that very clear by saying that it was not speaking to whether, for example, zoning or traffic control might remain the subject of local law. Now, my friends on the other side say that they're not and that all of those matters are part of a comprehensive scheme. But I think if you look at IGRA, you'll see that the Gaming Commission regulates or deals with those peripheral matters very differently than it deals with gaming itself. What rights does a tribe keep after IGRA in this case? In this case, so we start with the statute that is specific to this tribe, the Settlement Act, which allows all of the state and local permitting requirements to remain in force on tribal land, which was part of the settlement and memorialized in the statute. Then Congress passes IGRA. And I think it's important to note at this point that the only reason that IGRA applies at all to the lands that are at issue in this case is because they are the subject of a settlement. They were taken into trust after the passage of IGRA. Ordinarily, IGRA would not apply to them. But there's an exception in IGRA in 2719 that says that lands taken into trust pursuant to a settlement may be subject to IGRA. So the only reason that we're having this discussion about IGRA at all is that there was a settlement. So our position is that under the panel's prior ruling, the passage of IGRA prevents the town or the commonwealth from regulating gaming per se. I go back to my answer to Judge Kayada a couple of minutes ago. But in all other respects, its regulatory authority remains undiminished because that's the agreement that the parties reach. Can the town decide what the building should look like? There can be aesthetic requirements, Your Honor, yes. That is something that if they apply uniformly throughout the town to everyone who builds a building, tribal and non-tribal alike, that's exactly the kind of requirement that is permissible under the Settlement Act. And that IGRA does not impliedly repeal because it does not have to do with the conduct of gaming. Can the town decide what color the building's going to be? I think that it could, Your Honor. That, again, if it's a neutral, generally applicable rule that is applied throughout the town, is going to apply on the settlement lands just as it applies anywhere else. What part of the operation of the casino do you have a say as to? What part of the operation of the casino? Yes, because operation is one of the things you say you have a right to do, to control. No, I'm not sure that that's right, Your Honor, that operating the casino in the town would raise... This is operation of the casino. You're referring again to the Community Associations complaint? Yes. So, I think operating the casino, Your Honor, would raise... Well, I also think that's in the order of the court that's appealed from. This is operation. Yes, so that they can't operate the casino without complying with the laws and regulations. One example of that, I think, would go to the colloquy that Judge Thompson had with my friend having to do with liquor regulation. Well, could they say you have to have three dealers instead of one? No. How do you determine that? Do we have a federal case every time you say three and they say one, etc., etc.? The reason my answer is no, Your Honor, is because the actual regulation of the game, and I think it's important to remember that this is just class two gaming, which is bingo, but whereas if it were table games, class three gaming, there would be a negotiation between the state and the local government. You're right there. Let's change it. Bingo has to have X amount of prizes. No, we're not claiming any authority to regulate the actual conduct of the gaming, and I think your question is an excellent example of something that we would not claim authority over, precisely because that is an area where IGRA is a detailed federal regulation. What it is not is a detailed... What about the number of parking lots, parking spaces? Yes, I think parking is something that the town can regulate and is a good example of something that would be regulated the same way, whether the casino were a casino or a nightclub or a performance space or a large commercial building. The town's interest in regulating the availability of parking, the environmental impact of clear-cutting space for parking, and the impact on traffic on the town's main road, those would all be the same, irrespective of whether it's a casino or a different kind of facility. It's a good example of something the town does have authority to regulate, because the gaming commission, the federal gaming commission, does not regulate those things. I think you could see, though, that any one of those that you just mentioned, regulations could be applied in a way with a wink-wink that effectively precludes a successful operation of a casino. In other words, they don't provide enough parking spaces. So you can't have... You've got to have a certain volume of people there to make the casino successful. So how... To go back to Judge Tarawaia's questions, I assume when that happens, there would be a federal case. I think that that's right, that the tribe would be bringing a federal case saying that this is a pretext, but I think it's... So this could go on and on and on and on. Well, respectfully, Your Honor, I think that... I mean, look at how many years this has been going on now. This case has been going on for a long time, but the relationship between the town and the tribe has gone on for much longer, and for this project, the relations between the town and the tribe on regulatory matters have been quite amicable. They certainly denied that in their reply brief. They strenuously denied that assertion in their reply brief. I understand that they denied that, Your Honor, but they have sought permits in the past and they've granted permits in the past, and they don't dispute that central fact. I think they dispute what inferences the court should draw from it. But the tribe is integrated into the life of the town. The town administrator and chief of police and many other key figures in the town are members of the tribe, and the cooperative. I think even in the opening brief, you see that there were discussions going on between the tribe and the Martha's Vineyard Commission before these proceedings resumed in the district court. So I don't think that everything is going to be the subject of litigation, just as I agree with Judge Saylor that there is absolutely no evidence that anything that's been applied against the town to date has been a potential, as I said, a kind of wink-wink application of litigation. That is just possible. Everyone, for my time, if the court has no further questions, I'll ask the court to move on. Thank you. Thank you, Attorney Jay. If you could mute your audio and video, and if Attorney Crowell could unmute his audio and video. Yes, I'm here. Thank you. Judge Tway, if you're ready, we can hear from Attorney Crowell for rebuttal. Thank you. That last discussion, I think, is very telling, because I think it goes to why Congress intended to put construction, occupation, and operation of gaming facilities within the regulatory scheme that's to be— Excuse me. I don't mean to interrupt you. Can we make sure that Judge Tway is hearing? Excuse me, Mr. Crowell. Please wait. Sure. Judge Tway, can you hear us? We can't hear you. Judge Tway, I think the microphone on the side of your headphone needs to swing down in front of your face. There's a microphone on the side, Judge. If that swings down, we can hear you. Okay. Sorry. No, that's good. Thank you, Judge. I'm going to let Attorney Crowell begin his rebuttal. Very good. There is a reason that Congress intended to put construction, occupation, and operation of gaming facilities within the regulatory scheme as it relates to governing gaming activities on Indian lands. The reference to gaming-related actions in the homeowner's intervention complaint is just an example that when we're talking about bodies of law here that are preempted, we're talking about those that interfere with the tribe's exercise of its gaming rights under IGRA. Let me make sure I understand the statute. When IGRA was passed, doesn't it apply to tribal lands where there is no settlement agreement and where there is no right of the local community to regulate on the tribal lands? It also applied to those tribes that had settlement statutes prior to the enactment of IGRA that provide for- Sure. Sure. So it applies to both. So if it didn't have some regulations, if it didn't require that there be some minimum regulations having to do with construction and operation of the casino, then you'd have some casinos with no one regulating. I don't think that would be the case in reality. For any project- You would have some casinos where no non-tribal law required any regulation. Right, but I know of no situation where there would be a void in tribal law addressing that. In fact, most tribes in those circumstances adopted laws, tribal laws, that meet or exceed boundaries. But there's a whole much larger universe of tribes that were in existence in the passage of IGRA that were subject to Public Law 280, which provided- Sure, but Congress, I guess what I'm getting at is if you're sitting in Congress, it's one thing to say, we're going to make sure there are some laws, so here are these federal ones that apply to all of them. But it's another thing to say, and for those where the tribe has agreed that local law will apply, we're going to preempt that and yet not say it? It seems odd that Congress would take such a step without saying it. Well, I believe that they in fact did that. And we cite from the Senate report and we cite from the sponsors of the bill of their intention that there be preemption of state law regarding this field. The Sequan V. Roach case that we cite out of the Ninth Circuit, there the state attempted or the local county sheriff attempted to use the jurisdiction that had preexisted under Public Law 280 to go in and take an enforcement action against the Sequan's gaming operation. And the Ninth Circuit properly said whatever jurisdiction you might have had over governance of gaming prior to the passage of IGRA was preempted in the passage of IGRA. So I think you're saying Narragansett is wrong because Narragansett goes on at length to say it's tempting to have a bright line categorical test, but we don't think that works. Instead, it's going to be the slow slog of going through issue by issue as applied. What I hear you basically saying is forget about that. There's a categorical test. There can't be any town regulation. I'm sorry if I came across that way. I don't think that's the case. I think nobody's disputing now that IGRA preempted those laws that authorize particular forms of gaming within the state or prohibit particular forms of gaming. The Narragansett opinion said we can't tell you and we're not going to opine based on what the record in front of us of where you draw those fine lines of those issues that are at the edge. What we're arguing is Narragansett's correct about that, but when the subject matter is something that's clearly within the regulatory scheme established by Congress and the construction operation and occupancy of the gaming operation are a clear example of that, then that's easily on this side of the line. The examples that this court gave in Narragansett dealing with lodging or zoning are dealing with where are subjects that are not expressly included within Congress's comprehensive regulatory scheme, and those are where you have this difficult debate as to whether it is or is not included. Let me make sure I understand what you just said. So you're saying some zoning laws could apply to the construction of this casino? The hypothetical certainly isn't in front of us, but if there's other than their blanket law that says no commercial development, if there's a situation, for example, lodging, if the tribe decided to put up a resort next to the gaming facility, there's this debate that's been long-lasting in Indian country between states and tribes as to whether that's to be included as gaming-related or not. So there are certainly issues to where that fine line is difficult to draw, but we believe that the circumstances here where he has expressly stated in his order if it's related to construction, operation, or occupancy of the gaming facility, it should be clearly preempted. The ability of the town, if this decision is affirmed, to simply say, well, we're going to treat you like everybody else, but nobody else can operate a gaming facility. So they're going to say, well, this kind of facility has to be blue. This kind of facility can have no lighting. This kind of facility can only have three parking places. This kind of facility can only operate between ten and two. The notion that there's, oh, well, we're going to compare you to everybody else when the tribe is the only entity on the island, and currently within the state, or non-Indian, strike that. The only entity on the island that's able to construct a gaming facility, they're going to do the nod, nod, wink, wink that you talked about. And that's the type of interference with the tribe's governance of gaming rights that makes the application preempted and repugnant. That's the type of interference with the tribe's gaming activity, which is why Congress preempted the field, which is why the Supreme Court reiterated in the NCAA case that when you occupy a field, that means even if you've got a body of state law that theoretically, in some circumstances, could run concurrent and consistent, it's still preempted. This opinion, if allowed to stand, allows the town and the Martha's Vineyard Commission to kill the tribe's gaming operation with a thousand cuts. Just one more point of clarification, please. So right now, you're asking us to concern ourselves with the facility itself, and we'll take up whether housing is included or a resort. You're saying we can worry about that down the road? Yes. We think that's right. If there's a situation that comes about, a particularized circumstance that falls within that penumbra on the edges of Igor's preemptive field, we think that that could be resolved in later litigation. We would hope that you would never get to that point because first, you still can have government-to-government communications like tribes and local jurisdictions have done throughout the United States. There's no tribe operating Class II gaming facilities that are subject to state, county, or local zoning laws, and this will make a point of aberration. The ability for the town to interfere and do indirectly what it can't do directly is the interference that makes the application of town laws inapplicable. We think the proper law is to reaffirm Narragansett and to say the guidance that this court provided there should continue to be the guidance here. But here, when you're dealing with a subject matter that clearly is within the regulatory scheme enacted by Congress, you don't have to go through that tenebrous analysis. Now, also, if we couldn't reach a local agreement, you still have the ability to go to the Tribal Gaming Agency, which is an independent, highly qualified regulatory unit, the Federal National Indian Gaming Commission, which has jurisdiction to ensure that the tribe's facility is constructed and operated in a manner that is safe to the public. You could even go to the U.S. Attorney's Office because if the tribe is acting in violation of its gaming laws and in violation of NIGC regulations, the U.S. Attorney's Office would also have jurisdiction. They have remedies, but what they're trying to do is impose their will on the tribe in a manner that's going to kill the gaming facility. Thank you. Thank you. That concludes this argument in this case.